UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GENERAL MOTORS HOLDINGS LLC, GENERAL MOTORS LLC, and GENERAL MOTORS OF CANADA LIMITED,

        Plaintiff/Counterdefendants,

v.

ALLIED SYSTEMS, LTD. (L.P.),

        Defendant/Counterplaintiff.

                                                /

CASE NO. 11-11162

HON. MARIANNE O. BATTANI

**OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE SERVICE CONTRACT**

Before the Court is Plaintiffs' Motion for Partial Summary Judgment (Doc. No. 34), in which General Motors Holdings LLC, General Motors LLC, and General Motors of Canada Limited (collectively, "GM"), assert that they are entitled to judgment as a matter of law on Count I of the Amended Complaint–breach of contract--because of Defendant Allied Systems, Ltd "(Allied") anticipatory breach of the parties' Service Contract. Allied subsequently filed a Motion for Partial Summary Judgment on Count I of GM's Amended Complaint, and summary judgment on subparts (g), (h) and (i) with respect to Count III of the Amended Complaint, which seeks declaratory relief.  (Doc. No. 48).  The Court heard oral argument on Plaintiffs' motion on December 1, 2011, and at the conclusion of the hearing informed the parties that it would take that motion as well as Defendant's recently filed motion under advisement.  The Court has reviewed all the filings, and for the reasons that follow, Plaintiffs' Motion is **GRANTED** and Defendant's motion is **DENIED**.

**I. FACTS**

GM is an original equipment manufacturer of cars and trucks. Allied provides logistics and transportation services. GM entered into a Service Contract for Logistics Services ("Service Contract" or "Agreement") with Allied, which covered a three-year term, beginning February 1, 2010. Pursuant to the Service Contract, Allied provided delivery and transportation services as well as yard management and vehicle haulaway services to GM.

On March 10, 2011, GM learned that the Teamsters had issued a 72-hour strike notice to Allied after Allied unilaterally reduced the wages of its Teamsters employees for work performed in the prior week and thereafter. (Doc. No. 22, Am. Compl. at ¶ 30). The same day, GM requested adequate assurances from Allied that Allied would perform its contractual obligations. (Id. at ¶ 31). Allied responded by letter the next day. It informed GM that it was holding checks to pay the Teamsters a "make-up" payment to avert or end the strike should it occur. (Id. at ¶ 32). Allied also stated it was within its rights under the Collective Bargaining Agreement, and that the earliest date the Teamsters could strike was March 16, 2011. (Id.)

GM was dissatisfied with Allied's response and indicated to Allied that the letter did not provide adequate assurances. (Id. at ¶ 33). Allied subsequently informed GM that it was ready to pay the Teamsters as needed to end the strike, that the strike had been delayed to March 17, 2011, and that Allied believed it had provided GM with adequate assurances of performance. (Id. at ¶ 34).

On March 15, 2011, GM met with Allied to discuss the situation. After the conversation, GM sent Allied a letter confirming GM's understanding that Allied agreed to provide a make-up payment to avert the potential strike and take any action needed to avert a strike, an understanding contrary to Allied's. Moreover, on March 16, 2011, Allied "advised GM that it could not continue to provide services to GM under the Service Contract if GM did not agree to execute new or amended contracts with extended terms and increased pricing. (Doc. No. 34, Ex. 5). GM responded with an email stating that the "terms" of the proposal were "wholly unacceptable to GM." (Doc. No. 34, Ex. 8).

The following day, March 17, 2011, Allied emailed GM, that "[a]fter 6:00 am EDT this morning, it would be "unable to serve those customers who have not agreed to new contract terms." (Doc. No. 22, Am. Compl. at ¶ 40). According to Allied, 'unable" meant it "was no longer financially able to continue operations for GM without new terms." (Allied's Second Discovery Resp.,Response to Request for Admission No. 20).

In response, GM faxed Allied a letter in which Plaintiffs advised Allied that due to the breaches and repudiation of the Service Contract, GM had begun seeking cover by contracting with third-parties to provide the services that Allied was obligated to provide. GM terminated the Service Contract effective immediately pursuant to Paragraph 20 of the Agreement. (Doc. No. 22, Am. Compl. at ¶¶ 42-43). Allied stopped providing services.

The Service Contract includes provisions relative to Logistics, Special Haulaway, Special Yard-Management, and Rate Schedules, which outline the parties' obligations. In Section 1 of the Logistics General Terms, which governs the provision of Services:

> Provider [Allied] **agrees to provide, on a nonexclusive basis, services, including transportation-related services, to Buyer [GM] in accordance with the terms of this contract and the Statement of Requirements or Statement of Work (as may be amended by the parties from time to time)** which has been provided to [Allied] and is incorporated into this contract by reference ("Services"). In the event of a conflict between any provision of these General Terms and Conditions and the Statement of Requirements or Statement of Work, these General Terms and Conditions will apply with respect to the Services covered by such Statement of Requirements or Statement of Work.
>
> **Nothing contained herein shall be deemed to constitute a representation regarding minimum levels of Services or assured levels of compensation by [GM].** Service volumes are subject to change and [Allied] accepts the risk of such volumes fluctuations. [Allied] acknowledges that the Services may be a part of a global network of service providers providing the same or complementary services and [Allied] will be expected to perform the Services in cooperation and collaboration with such other service providers.

(Service Contract, page 4, Logistics Terms § 1) (emphasis added). In § 3, the parties agreed that the details related to other Services could be set forth in appendices:

> Routes, charges, and operational details related to the Services may be set forth in one or more appendices to his contract ("Appendices"), which are hereby incorporated by reference into this contract. In the event of a conflict between any provision of this contract and an Appendix, the most recent Appendix will apply with respect to Services covered by such Appendix.

(Service Contract. p. 4, Logistics Terms § 3).

Although the Service Contract references a Statement of Requirement or Statement of Work, neither existed at the time the parties reached the Agreement. (Doc. No. 49, Ex.1). GM and Allied did agree to a fifty-seven page Appendix D of Rate Schedules, which defines the locations, demand areas, and rates for the Services Allied agreed to provide to GM.

Pages 51 to 105 of the Rate Schedules identify the vehicle distribution centers and vehicle assembly centers for which Allied was to provide vehicle haulaway services.

4

Under the Special Haulaway Terms, which govern Allied's obligation to "furnish to [GM] . . .complete delivery and transportation services." The parties expressly acknowledge[d] that GM could "use related and nonrelated companies for the performance of Services. (Service Contract, p. 14, Special Haulaway Terms § 1 (as amended per Appendix A, p. 45)). Haulaway services involve the logistics of transporting new vehicles from GM's manufacturing plants to other locations. (Am. Comp. at ¶ 18). Under the terms, Allied had to dispatch all vehicles within three working days. (Service Contract § 5(a)). The parties agreed to exclude the Bowling Green location from the three day requirement and allowed five working days to dispatch the vehicles. (Id.)

Pages 106-107 of the Rate Schedules identify the assembly centers at which Allied was to provide yard management services. Each schedule describes the payment rates.

Under the Special Yard-Management Terms, pursuant to which Allied agreed to furnish to GM "completed yard management services. . .including plant releasing, unloading and loading motor vehicles onto rail cars and movement of new vehicles within the facility. (Service Contract, p. 21, Special Yard-Management Terms § 1).

In addition, GM and Allied subsequently agreed to add additional facilities. The amendments included a rate schedule that identifies the demand areas for which Allied was responsible and the rates GM agreement to pay Allied for transporting GM's vehicles to those demand areas. (Doc. No. 44, Ex. 9 at ¶ 9, Exs. D, E and 21).

GM filed its Amended Complaint on April 13, 2011. In the Amended Complaint, Plaintiffs allege breach of the Service Contract in Count I and seek summary judgment based on Allied's repudiation. Specifically, GM alleges that Plaintiffs complied with their obligations, but Allied breached and repudiated when it stated it was unwilling to perform

its obligations, demanded extra-contractual payments, and failed to provide adequate assurance of the performance of its obligations. According to GM, Plaintiffs suffered damages through increased costs of obtaining services from third parties that Allied was obligated to perform.

Both parties seek summary judgment on Count I. Defendant also seeks summary judgment on Count III, wherein GM asks the Court to enter a declaratory judgment in its favor that under the doctrine of recoupment the alleged Allied payable shall be reduced by the amount of GM's damages caused by Allied's breaches of the Service Contract; that the amount shall be reduced by the amount of GM's damages caused by Allied's breaches of the Lease; and under the doctrine of setoff, that GM is entitled to deduct its damages caused by both breaches of the Service Contract and the breaches of the Lease.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) authorizes a court to grant summary judgment if "the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." There is no genuine issue of material fact if there is no factual dispute that could affect the legal outcome on the issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining whether to grant summary judgment, this Court "must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." Hawkins v. Anheuser-Busch, Inc., 517 F.3d 321, 332 (6th Cir. 2008). However, the nonmoving party "cannot rely merely on allegations but must set out specific facts showing a genuine issue for trial." Chappell v. City of Cleveland, 585 F.3d 901, 906 (6th Cir. 2009).

### III. ANALYSIS

#### A. PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

The parties dispute whether Allied breached the Service Contract when it stated it could not and would not perform. To recover for breach of contract under Michigan law, a plaintiff must prove: 1) the existence of a contract, 2) the terms of the contract, 3) that the defendant breached the contract, and 4) that the breach caused the plaintiff injury. Webster v. Edward D. Jones & Co., 197 F.3d 815, 819 (6th Cir. 1999).

A contract also may be breached when a party to the agreement repudiates his obligation to perform under the contract. See RESTATEMENT OF CONTRACTS (SECOND) § 250. "Under the doctrine of anticipatory breach, if a party to a contract, prior to the time of performance, unequivocally declares the intent not to perform, the innocent party has the option to either sue immediately for the breach of contract or wait until the time of performance." Brauer v. Hobbs, 391 N.W.2d 482, 485 (Mich. Ct. App. 1986). "In determining whether an anticipatory breach has occurred, it is the party's intention manifested by acts and words that is controlling, and not any secret intention that may be held." Paul v. Bogle, 484 N.W.2d 728, 735 (Mich. Ct. App. 1992).

Here, there was no room for misunderstanding or differing interpretations; Allied's communication with GM was unequivocal. On March 17, 2011, Allied contacted GM and informed GM that Allied was not able to provide services unless GM agreed to new contract terms.

Consequently, GM sought to ensure Allied's performance. The Service Contract expressly provides GM the opportunity to seek reasonable assurances. The Service Contract allowed GM to demand adequate assurance of performance.

> If reasonable grounds for insecurity arise with respect to Service Provider's ability to perform its obligations under this Agreement, Buyer may demand in writing adequate assurance of due performance by Service Provider of its obligations under this Agreement.

(Service Contract, p. 2, ¶ 9).

The parties' dispute centers on the terms of the Service Contract. At the outset, the Court observes that not all terms are disputed. For example, there is no dispute that the Service Contract contains no minimum levels of Services to perform and no assured level of compensation. Nor is there any dispute that the Service Contract does not require exclusivity on Allied's part. Therefore, Allied is free to contract with other manufacturers inasmuch as it is providing Services on a nonexclusive basis. Nevertheless, there is no provision in the Service Contract authorizing GM to do so. Finally, there is no dispute that the parties agreed that Allied would transport vehicles manufactured by GM en route to GM's dealers as well as yard Services and carhaul Services to particular demand areas. According to Allied, in spite of all these provisions, its repudiation was immaterial because the Service Contract merely sets forth regulations to govern the parties' duties with respect to service GM decides to source to Allied and Allied elects to perform. The Service Contract does not require Allied to provide any specific car haul or transportation Services to GM–there are no minimum volumes, and the Service Contract does not require GM to use Allied to perform specific car haul or transportation Services. The agreement merely specifies how Allied is to perform Services and how GM is to pay.

Allied is correct that there is no provision in the Service Contract wherein Allied promises to haul all of GM's vehicles from specified locations. Based on the omission, Allied contends the Service Contract merely governed how the Services would be

provided. The Court disagrees.

This Court's duty in interpreting the Service Agreement requires that it ascertain the intent of the parties. In re Egbert R. Smith Trust, 745 N.W.2d 754, 757-58 (Mich. 2008). Contractual language that is clear and unambiguous, must be enforced as written. Id. Contractual language, even where "inartfully worded," must be deemed unambiguous, when it "fairly admits of [ ] one interpretation." Holmes v. Holmes, 760 N.W.2d 300, 311 (Mich. Ct. App. 2008). The Court must give "effect to every word, phrase, and clause in a contract and avoid an interpretation that would render any part of the contract surplusage or nugatory." Woodington v. Shokoohi, 792 N.W.2d 63, 78 (Mich. Ct. App. 2010) (citing Klapp v. United Ins. Group Agency, Inc., 663 N.W.2d 447, 453 (Mich. 2003).

Overall, the Court finds that a fair reading of the Service Agreement demonstrates that it also governed what Services Allied was to provide. The fact that GM cannot point to a specific provision in the Services Contract that was breached is not necessarily fatal to its claim. Nor is the fact that the Service Contract does not specify that GM must use Allied for a specific volume. The failure to require a minimum level of Services or an assured level of compensation does not mean that neither party had an ongoing duty.

Here, Allied's interpretation defies common sense, particularly in light of the fifty-seven page Appendix D, which defines locations, demand areas, and rates for service Allied was to provide and GM was to pay. Simply put, under the Service Agreement, Allied agreed to provide Services. The rates, charges, and operations details of the Services were included in the appendices. (Service Contract, p. 4, § 3). Although the Service Contract is silent relative to Allied's obligation to haul all GM vehicles, other provisions in the Agreement demonstrate that this was the parties' intent.

For example, GM agreed not to "resource any portion of this contract" with a few articulated exceptions complete with deadlines. (Service Contract, p. 1, ¶ 11). Specifically, the Service Agreement carved out an exception that required GM to "resource the Janesville VDC Haulaway Operations to an alternative service provider no later than July 1, 2010." (Id., p. 3, ¶ 11). If Allied was not obligated to provide Services for the Janesville location and demand areas identified on page 75 of Appendix D, and GM was not obligated to source the work to Allied, the resource provision would be meaningless. Under Allied's interpretation, GM could contract with another company at its own discretion.

Other provisions in the agreement likewise demonstrate why the Court rejects Allied's argument, including the following. Allied was responsible for annual snow-removal costs up to $40,000 at specified locations. (Service Contract, p. 46, § 9). In the event of a force majeure, GM could obtain Services from other sources without liability to Allied; and if it exceeded thirty days, GM could terminated the "relevant Appendix(ces) without liability." (Service Contract, p. 42, § 17). GM had the right to terminate the contract upon the insolvency of Allied. (Service Contract, p. 8-9, § 19). GM had the right to terminate the Service Contract in the event of changes in control of Allied. (Service Contract, p. 43, § 20). GM had the right to demand adequate assurance. (Service Contract, p. 2, ¶ 9).

These provisions in the Service Contract restricted GM's ability to resource and terminate the Service Contract. (Service Contract, p. 3, ¶ 11). More importantly, these provisions would be unnecessary if GM were not obligated to use Allied for the Services. Moreover, both GM employees deposed by Defendant stated that Allied agreed to haul all of GM's vehicles from the locations listed on page 1 of the Service Contract and

10

additional locations to the demand areas–those areas containing dealerships where the vehicles were to be hauled. (See Doc. No. 39, Ex.1 at 73-74, Ex. 2 at 66).

The Service Contract also contains a provision governing termination for breach or nonperformance:

> [GM] reserves the right to terminate all or any part of this contract without liability to [Allied], if [Allied] (a) repudiates or breaches any of the terms of this contract; (b) fails to perform Services as specified by [GM]; (c) fails to make progress so as to endanger timely an proper completion of Services. . .after receipt of written notice from [GM] specifying such failure or breach.

(Service Contract, p. 43). Again, this provision would not be necessary if GM had no obligation to Allied. Lastly, the Service Contract contains no option for Allied to decline Services.

In sum, in reading the contract as a whole, which the Court is required to do, Old Kent Bank v. Sobczak, 620 N.W. 2d 664, 667 (Mich. Ct. App. 2000), Allied's argument cannot withstand scrutiny. Allied concedes that many provisions of the Service Contract are consistent with an intent for Allied to haul all of the vehicles. Nevertheless, it asserts that the merger clause, contained in Section 32 of the Service Contract, limits consideration of parole evidence to contradict or vary the written agreement. UAW-GM Human Res. Ctr. v. KSL Recreation Corp., 579 N.W.2d 411, 414 (1998) (quoting Raska v. Farm Bureau Ins. Co., 314 N.W.2d 440, 441 (Mich. 1982). Here, the extrinsic evidence does not contradict the Service Contract. There is no provision in the Agreement that expressly states that Allied did not have to haul all the vehicles.

Nevertheless, given the ambiguity, the Court reads the contract as a whole and arrives at a construction that will give fair meaning to all of the language employed by the parties. City of Wyandotte v. Consol. Rail Corp., 262 F.3d 581, 585 (6th Cir. 2001).

Moreover, because "the extrinsic evidence presented. . .supports only one of the conflicting interpretations," summary judgment is appropriate. GenCorp, Inc. v. Am. Int'l Underwriters, 178 F.3d 804, 818 (6th Cir. 1999).

In sum, Allied was obligated to provide Services, and GM was obligated to purchase the Services. When Allied ceased providing services to GM because it could no longer afford to do so, it breached the parties' Agreement, and GM is entitled to summary judgment on Count I.

### B. Defendant's Motion for Partial Summary Judgment

In light of the Court's conclusion relative to GM's entitlement to summary judgment on Count I, Allied's motion must be denied. Further, its request for relief relative to Count III, which relied on its request for summary judgment on Court I, likewise must be denied.

## IV. CONCLUSION

For the reasons stated above, the Court **GRANTS** Plaintiff's Motion for Partial Summary Judgment and **DENIES** Defendant's motion.

**IT IS SO ORDERED.**

                        s/Marianne O. Battani
                        MARIANNE O. BATTANI
                        UNITED STATES DISTRICT JUDGE

Date: April 9, 2012

### CERTIFICATE OF SERVICE

Copies of this Opinion and Order were served upon Counsel of record via the Court's ECF Filing System.

                        s/Marianne O. Battani
                        Case Manager